UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DANIELLE MICHELLE BOSTON,

                Plaintiff,

    v.

NANCY A. BERRYHILL, *Acting*
*Commissioner of the Social Security*
*Administration*,

                Defendant.

**REPORT &
RECOMMENDATION
16-CV-00342-LJV-HBS**

---

## I.    INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") that plaintiff, Danielle Michelle Boston ("Boston") is not disabled and, therefore, is not entitled to Social Security Disability ("SSD") or Supplemental Security Income ("SSI") Benefits. The Hon. Lawrence J. Vilardo referred this case to this Court pursuant to 28 U.S.C. § 636(b) (Dkt. No. 9). Pending before the Court are Cross-Motions for Judgment on the Pleadings by Boston (Dkt. No. 8) and the Commissioner (Dkt. No. 13), pursuant to Federal Rule of Civil Procedure 12(c).

Boston challenges the Commissioner's determination on two grounds. First, Boston contends that the Commissioner erred in finding that her physical impairments did not meet the criteria for disability under 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.04(A), disorders of the spine. Second, Boston contends that the Commissioner erred in selectively rejecting the favorable portions of the opinion of state agency review neurologist Dr. Layne. Boston asserts that the Administrative Law Judge ("ALJ") afforded Dr. Layne's medical opinion "significant weight," but then erred by failing to provide any explanation for rejecting the portions of the opinion that were favorable to her claim.

1

The Commissioner responds that Boston did not meet her burden of satisfying all of the criteria for Listing 1.04(A); that the ALJ's step three finding is supported by substantial evidence; that the ALJ properly considered the medical opinion evidence; and that substantial evidence supports the ALJ's residual functional capacity ("RFC") findings.

For the reasons articulated below, the Court respectfully recommends granting the Commissioner's motion (Dkt. No. 13). There is substantial evidence in the record supporting the ALJ's determination that Boston did not meet or equal Listing 1.04(A). Further, the Court finds Boston's refusal to pursue carpal tunnel surgery as evidence that the condition is not disabling, which supports the ALJ's rejection of Dr. Layne's noted hand limitations. Additionally, the record as a whole supports the rejection of such limitations. The Court also recommends denying Boston's motion (Dkt. No. 8) in its entirety.

## II.    BACKGROUND

### A. *Procedural History*

Boston filed an application for SSD and SSI disability benefits on October 14, 2011. Certified transcript, Dkt. No. 7, at 11 (hereinafter [11]). Those claims were initially denied on January 26, 2012. [11]. The denial of those claims was not appealed for reconsideration. Boston filed a timely written request for a hearing on February 23, 2012. [11].  Boston appeared and testified before Administrative Law Judge ("ALJ") Nancy L. Pasiecznik on March 7, 2013 and a supplemental hearing was held on April 8, 2013. [11]. ALJ Pasiecznik retired and ALJ Donald T. McDougall assumed the duty to issue a decision, pursuant to HALLEX 1-2-8-40. [11]. Consequently, a third hearing was conducted on September 22, 2014. [11]. ALJ McDougall concluded in a written decision dated December 3, 2014, that Boston was not disabled within the meaning of the Social Security Act from August 17, 2010, through December 3, 2014. [8]. The

ALJ's decision became the final decision of the Commissioner on February 29, 2016, when the

Appeals Council denied Boston's request for review. [1].

Boston commenced this action on November 18, 2016 (Dkt. No. 1). Both parties moved

for Judgment on the Pleadings (Dkt. Nos. 8 (Boston), 13 (Commissioner)). The motions were

argued and submitted on papers (Dkt. No. 12 (extending response deadline to February 9, 2017,

and reply deadline to March 2, 2017)).

### B. Factual Background

Boston was born on August 13, 1975, and was 35 years old on August 17, 2010, the

alleged onset date of her disability. [47, 300]. Boston completed schooling through some of tenth

grade and later obtained a GED in 2008. [47, 336]. In the past, Boston worked as a cashier,

assistant manager, factory worker, telemarketer, and housekeeper. [336, 359–66]. Boston is a

single mother of six children, ages 11–16, living at home with her. [346–47]. She testified that

she performs light house work, shops for groceries, and drives on a limited basis. [64].

Boston was struck by a car on August 17, 2010, while standing on the shoulder of the

road. [497, 854]. She was transferred by ambulance to Erie County Medical Center ("ECMC"),

where she remained hospitalized until August 22, 2010 [440, 553]. As a result of the accident,

Boston suffered a broken nose, broken toe on her right foot, multiple rib fractures, multiple facial

scars, a broken tailbone, disc injuries to the cervical and lumbar spine, and a piece of her

forehead was missing. [47–48].

### C. Medical Background

On November 16, 2010, Boston was consultatively examined by Donna Miller, D.O., at

the request of the Commissioner. [497–500]. Dr. Miller's findings included: full strength (5/5)

and normal sensation in the upper extremities, full grip strength (5/5) bilaterally, intact hand and

finger dexterity, and no evident muscle atrophy. [498–500]. Regarding the cervical spine, findings showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. [499]. In the lumbar spine, Dr. Miller found limited flexion of 65 degrees, extension of 10 degrees, lateral flexion of 20 degrees bilaterally, and rotation of 30 degrees bilaterally. [499]. Additionally, findings showed full range of motion ("ROM") of the shoulders, elbows, forearms, and wrists bilaterally, as well as negative straight-leg raising ("SLR") tests bilaterally. [499]. Dr. Miller opined that Boston had a mild limitation for repetitive heavy lifting and carrying as well as bending. [500].

On December 23, 2010, Boston began treatment with neurologist Bajinder Singh, M.D., for headaches. [593]. Upon examination, Dr. Singh found full strength (5/5) throughout, normal reflexes (2+) throughout, and a normal gait. [594]. Findings further showed a decreased sensation to pinprick and light touch to the fourth and fifth digits of the right hand. [594]

On January 13, 2011, Boston returned to Dr. Singh for continued headaches. [590]. Again, upon examination, Dr. Singh assessed full motor strength (5/5) throughout, normal reflexes (2+) throughout, and normal sensation. [590]. Dr. Singh requested a follow-up appointment with Boston in 3–4 weeks. [590].

On January 17, 2011, a nerve conduction velocity ("NCV") study of the right upper extremity revealed right-sided moderate to severe carpal tunnel syndrome ("CTS"). [649]. A neurologic examination by Dr. Singh showed full strength (5/5), normal reflexes (2+), and normal sensation in all four extremities. [649].

On February 1, 2011, Boston returned to Dr. Singh for a follow-up on her headaches and neck tenderness. [591]. Upon examination, Boston continued to show full motor strength (5/5) throughout, normal reflexes (2+) throughout, and normal sensation. [591]. Boston had been

wearing a carpal tunnel brace at the time of the appointment, which she informed Dr. Singh had been helping. [591]. Dr. Singh instructed Boston to continue wearing the brace on her right hand and return for another follow-up appointment in 3–4 weeks. [591]. Dr. Singh ordered another NCV and an electromyography ("EMG") study of the left hand, due to tingling and numbness, and a cervical magnetic resonance imaging ("MRI") study. [591]. The MRI was conducted on February 7, 2011, and  revealed a small to moderate left paracentral disc herniation at C5–C6 impinging on the exiting left C6 nerve root, a small herniated disc at C3–C4, and disc bulges at C4–C5 and C6–C7. [589]. The EMG and NCV study of the left upper extremity, conducted on March 14, 2011, revealed findings consistent with a possible C6 and C8 subacute radiculopathy [645–48].

On April 26, 2011, Boston had a neurosurgical consultation with Jody Leonardo, M.D., for persistent cervical and upper extremity pain. [632]. Examination findings showed full grip strength (5/5) on the left, unspecified grip strength on the right, and normal reflexes in the upper extremities. [633]. Dr. Leonardo noted that based on the MRI evidence, Boston "does have evidence of foraminal stenosis due to a disc bulge, primarily at the C5–C6 level on the left, but not necessarily on the right." [633].

An MRI of the cervical spine on May 3, 2011 revealed: (1) no evidence for central canal or foraminal stenosis at C2–C3; (2) a central disc herniation of the extrusion type measuring approximately 2mm, which effaces the anterior subarachnoid space at C3–C4; (3) a minimal broad based central disc herniation of the protrusion type measuring less than 2mm, which minimally impinges upon the anterior subarachnoid space at C4–C5; (4) a broad based central/left paracentral disc herniation of the protrusion type measuring approximately 4mm, which impinges upon the anterior/left anterior aspect of the spinal cord at C5–C6, with a

significant impingement upon the exiting left C6 nerve root is suspected; and (5) a minimal diffuse disc bulge of the annulus fibrosis measuring less than 2 mm, which minimally impinges upon the anterior surface of the thecal sac at C6–C7. [655–56].

Boston revisited Dr. Leonardo on May 12, 2011 for continued complaints of neck and bilateral upper extremity pain. [635]. Boston informed Dr. Leonardo that the pain in her right upper extremity was slightly worse than her left. [635]. Examination findings revealed full strength (5/5) in the upper extremities bilaterally, intact sensation, and normal reflexes (2+) bilaterally. [635]. Dr. Leonardo opined that Boston has evidence of a possible C5–C6 subacute radiculopathy on her left side and "clearly has carpal tunnel symptoms…and signs on exam that is significant with this." [636]. Dr. Leonardo further noted that she does not believe Boston's cervical disease was accounting for enough foraminal stenosis to cause the right upper extremity pain [636]. Boston expressed that she did not wish to pursue surgery for either carpal tunnel or her cervical and right upper extremity radiculopathy. [636]. Dr. Leonardo recommended that Boston see Dr. Pilly for a final attempt at conservative treatment. [636]. Dr. Leonardo advised Boston to return for another surgical evaluation if she continued to fail conservative treatment. [636].

Boston consulted with pain specialist Vikas Pilly, M.D., on June 9, 2011 for a physiatry evaluation of her neck and bilateral arm pain. [660–63]. Upon exam, Dr. Pilly found full strength (5/5) throughout, intact sensation, normal muscle tone in the upper extremities bilaterally, decreased reflex only at the bilateral triceps, and full active range of motion ("AROM") in the spine with no pain. [661–62]. However, Dr. Pilly did find that AROM was decreased in all planes in the neck. [661–62]. Dr. Pilly further found negative SLR tests bilaterally, negative Finkelstein's tests bilaterally, negative Phalen's tests bilaterally, and negative Tinel's signs

bilaterally [662]. Dr. Pilly ordered a repeat EMG/NCV of both arms and opined that he does "not feel that clinically she has CTS." [662].

An MRI of the cervical spine conducted on November 30, 2011 showed at C5–C6 a broad based central/left paracentral disc herniation of protrusion type extending into the left neural foramen associated with bilateral facet joint arthropathy and unconvertebral joint hypertrophy resulting in mild to moderate neural foraminal narrowing on the right and moderate to severe neural foraminal narrowing on the left. [737]. At C5–C6 there was also effacement of anterior subarachnoid space and mild indentation on the ventral aspect of the spinal cord. [737].

On December 20, 2011, Boston was consultatively examined by Guatam Arora, M.D., at the request of the Commissioner. [749–52]. Dr. Arora found upon examination a limited range of cervical spine motion, with reduced forward flexion of 30 degrees, extension of 10 degrees, lateral flexion of 15 degrees on the right and 20 degrees on the left, and rotation of 40 degrees bilaterally. [751]. Dr. Arora further found no sensory deficit, full strength (5/5) in the upper and lower extremities, and a slightly reduced grip strength (5-/5) on the left. [751]. A SLR test was found negative bilaterally. [751]. Boston was diagnosed with: (1) Cervicalgia; (2) Lumbar strain; (3) Carpal tunnel by history; (4) Posttraumatic headaches; (5) Hypertension; and (6) Seizure by history. [751–52]. Dr. Arora further opined that claimant has a "moderate limitation of activity requiring complete ROM of C-spine motion" and a "moderate limitation of bending, twisting, lifting, and carrying." [752].

Boston visited Dr. Singh on eight different occasions between November 4, 2011 and July 6, 2012. A motor exam conducted on each visit revealed full strength (5/5) throughout. [756–61, 824–33]. Sensory exams all exhibited that distal extremities X4 were intact to light touch. [756–61, 824–33]. Reflexes were found to be normal (2+) throughout all eight visits.

[756–61, 824–33]. During Boston's visit on December 15, 2011, Dr. Singh reported that an EMG showed right-sided CTS. [758]. Dr. Singh further opined on December 27, 2011 that Boston has bilateral CTS and instructed her to continue wearing a carpal tunnel brace. [760].

On May 24, 2012, Edward Layne, M.D., a consulting neurosurgeon, reviewed Boston's file and "affirmed as written" the assessment completed on January 24, 2012, by non-physician disability examiner C. Wahl. [806]. Dr. Layne further reported that the medical evidence of record ("MER") showed that all studies were normal. [806]. In the affirmed assessment, Wahl opined that Boston is limited in handling (gross manipulation) and fingering (fine manipulation) and "repetitive motions of hands is limited to occasional due to [CTS]." [177]. Wahl further found: (1) decreased ROM in Boston's cervical and lumbar spine, (2) negative SLR tests bilaterally, (3) full strength throughout, (4) no sensory deficits, and (5) slightly reduced (5-/5) grip strength on the left. [176–77]. Boston reported that she was limited in lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching, and using hands. [179]. Wahl noted that Boston's reported limitations were not fully consistent with her MER and were deemed partially credible. [179].

On January 15, 2013, upon referral by Dr. Singh, Boston began treatment with pain management specialist Pratibha Bansal, M.D. [871]. Upon exam, Dr. Bansal found full motor strength (5/5) throughout, a decreased response to tactile stimulation over the ulnar distribution, a negative Tinel's test at the elbow and wrists, a negative SLR test, and normal upper extremity reflexes. [873–74]. Dr. Bansal further noted an extensive amount of myofascial pain in the neck, shoulder, and upper back. [874]. Subsequent examinations conducted by Dr. Bansal on February 6, February 20, March 5, and April 2, 2013 all revealed normal sensation, motor strength, and deep tendon reflexes in the upper extremities. [867–68, 864–66, 861–63, 906].

On June 2, 2013, Dr. Singh saw Boston for headaches, neck pain, and on and off leg pain. [923]. Dr. Singh's evaluation of the upper extremities was unremarkable as it showed normal sensation, full motor strength (5/5), and normal reflexes. [923]. Dr. Singh instructed Boston to follow up with pain specialist Dr. Bansal and to continue wearing the carpal tunnel brace. [924].

On September 25, 2013, Dr. Singh treated Boston for headaches, numbness in her hands, and neck pain. [919]. A physical examination once again revealed normal sensation, full strength (5/5), and normal reflexes in the upper extremities. [919]. However, Dr. Singh ordered a repeat nerve conduction study because the numbness in Boston's hand was getting worse. [920]. Dr. Singh noted that Boston wanted to go for the carpal tunnel surgery, but he wanted her to complete the nerve conduction study before any surgery occurred. [920].

On November 27, 2013, Dr. Bansal saw Boston for pain in the neck, flowing down the left shoulder, and into her fingers and wrists. [944]. Upon examination, Dr. Bansal found decreased sensation in the right ulnar and a positive Tinel's sign in both wrists. [945]. Dr. Bansal further found normal motor strength and deep tendon reflexes in the upper extremities. [945]. Examinations performed by Dr. Bansal on five subsequent visits in 2014 (January 13, January 28, March 20, April 24, and May 28), all revealed similar findings. [926, 929, 932, 938, 942].

On January 3, 2014, Boston returned to Dr. Singh for a follow up on her headaches, neck, and shoulder pain. [901]. Boston informed Dr. Singh that she was experiencing left arm pain, and that her neck pain was worsening. [901]. However, similar to her visit on June 2, 2013, Dr. Singh's evaluation findings were unremarkable with full strength (5/5), normal sensation, and normal reflexes in the upper extremities. [901]. Dr. Singh ordered an MRI of the cervical spine. [902].

On February 10, 2014, Boston returned to Dr. Singh for another follow up and to review the MRI that was completed on January 24, 2014. [903]. The MRI showed multiple level disc bulges with a main bulge located at C5–C6, measured at 5mm. [903, 908–10]. Slight progression of intervertebral disc pathology was noted since the previous MRI completed on November 20, 2011. [910–13]. Once again, Dr. Singh's evaluation findings were unremarkable showing normal sensation, full strength (5/5), and normal reflexes in the upper extremities. [903].

Boston returned to Dr. Singh on April 30, 2014, and June 13, 2014. [948–949]. During both appointments, examination findings revealed full motor strength (5/5) throughout, normal reflexes (2+) throughout, and normal sensation. [948–949]. On the latter visit, Boston informed Dr. Singh that she wanted to seek a neurosurgical opinion for her neck pain. [948]. Dr. Singh sent Boston for carpal tunnel physical therapy ("PT") and occupational therapy ("OT") evaluation and for pain management. [948].

On July 8, 2014, Boston was seen by Kevin Cuddahee, F.N.P., for continuation of her symptomatology. [1085]. Upon examination, Mr. Cuddahee found full strength (5/5) and normal reflexes in the upper extremities bilaterally. [1086]. After reviewing the most recent MRI, performed on January 24, 2014, Mr. Cuddahee noticed "mild progression of [Boston's] spondylosis most significantly at C5–C6 with a posterior disk protrusion causing central stenosis." [1086]. In addition, Mr. Cuddahee noted that Boston's cervical spine pain has been "refractory to medical management" through physical and medication therapy. [1086]. Mr. Cuddahee recommended a repeat EMG and nerve conduction test (last one completed in 2011) and noted that surgical intervention at this point would be completely elective. [1086]. The assessment by Mr. Cuddahee was also signed off by Dr. Leonardo. [1086].

An EMG and nerve conduction study of the right upper extremity by Tomas Holmlund, M.D., on July 30, 2014, revealed: (1) findings consistent with a right C8 radiculopathy with both active and chronic axonal loss, mild to moderate in degree electronically; and (2) very marked abnormalities in the right abductor pollic brevis ("APB") on needle EMG while other abnormalities in the C8 myotome were mild. [1089]. Dr. Holmlund opined that the EMG did not give an alternative diagnosis to the findings other than a C8 radiculopathy. [1089]. There was no electrodiagnostic evidence of a right median neuropathy, CTS, or right brachial plexopathy. [1089].

An MRI of the cervical spine conducted on August 28, 2014, showed: (1) no evidence of vertebral or ligamentous injury, (2) a disc protrusion at C5–C6 resulting in left foraminal encroachment and left parasagittal spinal cord indentation, and (3) no other significant degenerative change with the exception of C4–C5 where there is a small unconvertebral spur to the left. [1106].

Dr. Leonardo evaluated Boston on September 2, 2014, and discovered a decreased sensation to pinprick and light touch in the C8 dermatone. [1097–98]. Otherwise her exam was stable as she had a strong strength (5/5) in her upper extremities. [1097–1098]. Dr. Leonardo noted that she was unable to identify the cause of Boston's right C8 radiculopathy based on the most recent MRI (August 28, 2014) of the cervical spine. [1098].

Boston began PT with Rachel Sisson, D.P.T., on September 4, 2013. [1103]. During the initial evaluation, Ms. Sisson found: (1) mildly deceased strength (4/5) in the upper extremities bilaterally, (2) intact upper extremity sensation and reflexes bilaterally with the exception of C8 in the right upper extremity, (3) a positive Spurling's test, and (4) a limited ROM in the cervical spine. [1103].

An MRI of the brachial plexus on September 27, 2014 showed no significant findings other than the disc protrusion seen on the prior MRI of the cervical spine at C5–C6. [1105].

### D. Vocational Expert Testimony

The ALJ posed one hypothetical question to vocational expert ("VE"), Dawn Blythe. The ALJ asked the VE to assume that a hypothetical person of the same age, education and work experience as the plaintiff, is limited to light work as defined in the Commissioner's regulations, needs to change positions briefly (a minute or two at least every half hour) and can only complete simple, repetitive work. [76]. The ALJ further stipulated that the hypothetical individual should have no more than frequent contact with coworkers or supervisors, no more than occasional contact with the general public, no more than occasional bending at the waist and flexing of the neck, no extension of the neck or looking up, no rotation of the head or neck more than 45 degrees in either direction (90 degrees total), no use of ladders, ropes or scaffolds, no activity involving heights or dangerous moving machinery, no more than occasional balancing, stooping or crouching, and no kneeling or crawling. [76–77]. The VE testified that based on those conditions, that hypothetical individual would not be able to perform Boston's past work. [77]. However, the VE did find that such an individual would be able to perform the work of the following jobs: Mail Clerk, Marker II, Film Touch-up Inspector, or Addresser. [77–78]. Boston's former attorney, Richard G. Abbott, modified the ALJ's hypothetical by adding as a condition that the person was not able to use their dominant arm for manipulation (fine manipulation). [83]. The VE stated that a restriction of fine manipulation would preclude all four of the jobs previously stated. [83].

### E.  *The ALJ'S Decision*

The ALJ discussed the five-step sequential evaluation process that is used while determining whether a claimant is disabled. [12–13] (citing 20 C.F.R. §§ 404.1520(a), 416.920(a)). The ALJ proceeded to explain his findings of fact and conclusions of law which enabled him to reach his final determination. [13–34]. First, the ALJ determined that Boston meets the insured status requirements of the Social Security Act through December 31, 2010. [13]. Second, he determined that Boston has not engaged in substantial gainful activity since August 17, 2010, the alleged onset date, pursuant to 20 C.F.R. §§ 404.1571 and 416.971. Third, the ALJ determined that Boston has the following severe impairments: "post-traumatic disorders post-motor vehicle accident with vertebrogenic disorders of the upper and lower extremities; migraine headaches; nerve damage of the bilateral upper extremities due to cervical spine dysfunction; vertebrogenic disorder of the lumbar spine; anxiety; and depression." [13]. Fourth, the ALJ determined that Boston does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. [14]. Fifth, the ALJ articulated that Boston has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) & 416.967(b) with the following limitations:

> [Boston] must be able to change positions briefly (1–2 minutes) at least every ½ hour; no more than frequent contact with coworkers or supervisors; no more than occasional contact with the general public; only simple, repetitive, routine work; no more than occasional bending at the waist; no more than occasional flexing of the neck and no extension of the neck; no rotation of the head or neck more than 45 degrees in either direction (90 total); no ladders, ropes or scaffolds; no heights or dangerous, moving machinery; no more than occasional balancing, stooping, or crouching; and no kneeling or crawling.

[16]. Sixth, the ALJ determined that Boston is unable to perform any past relevant work [32] (citing 20 C.F.R. §§ 404.1565, 416.965). Next, Boston was deemed to be a younger individual, since she was 35 years old on the alleged onset date. [32] (citing 20 C.F.R. §§ 404.1563,

416.963). The ALJ also determined that Boston has at least a high school education and is able to communicate in English. [32] (citing 20 C.F.R. 404.1564, 416.964). Additionally, the ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." [32] (citing S.S.R. 82–41; 20 C.F.R. Pt. 404, Subpt. P, App. 2). Using Boston's age, education, work experience, and RFC, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." [32] (citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a)). Specifically, the ALJ determined that Boston can perform the work of a Mail Clerk, Marker II, Film Touch-up Inspector, and Addresser. [33]. These findings ultimately led to the ALJ's determination that Boston is not disabled, as defined by the Social Security Act, from August 17, 2010, through December 3, 2014. [34] (citing 20 C.F.R. §§ 404.1520(g), 416.920(g)).

## III.    DISCUSSION

### A.    *Scope of Review*

The only issues to be determined by this Court are whether or not the ALJ's decision that Boston was not disabled is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B.  Legal Standard

For purposes of Social Security disability insurance benefits, a person is disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's physical or mental impairment or impairments are of such severity that he or she is not only unable to do [his or her] previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

The plaintiff bears the initial burden of showing the impairment prevents her from returning to her previous type of employment.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform.*" Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

In order to determine whether the plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

> (1)  Whether the plaintiff is currently working;

> (2)  Whether the plaintiff suffers from a severe impairment;

> (3)  Whether the impairment is listed in Appendix 1 of the relevant regulations;

(4) Whether the impairment prevents the plaintiff from continuing her past relevant

work; and

(5) Whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry*, 675 F.2d at 467.  If a plaintiff is found to be either

disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends.  20 C.F.R.

§§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

However, it should be noted the ALJ has an affirmative duty to fully develop the record. *Gold v.*

*Secretary*, 463 F.2d 38, 43 (2d Cir. 1972).

In order to determine whether an admitted impairment prevents a claimant from

performing past work, the ALJ is required to review the plaintiff's RFC and the physical and

mental demands of the work she has done in the past.  20 C.F.R. §§ 404.1520(e) & 416.920(e).

The ALJ must then determine the individual's ability to return to past relevant work given the

RFC. *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994).

### C.  Step One

The first step of the five-step inquiry has not been disputed in this matter. Both parties

agree that Boston has not been engaged in substantial gainful activity since August 17, 2010, the

alleged onset date. [13]. Therefore, the Court finds that substantial evidence supports the ALJ's

finding for the first step.

### D.  Step Two

The second step of the five-step inquiry is also not disputed issue in this matter. The ALJ

determined that Boston had the following severe impairments: post-traumatic disorders post-

motor vehicle accident with vertebrogenic disorders of the upper and lower extremities; migraine

headaches; nerve damage of the bilateral upper extremities due to cervical spine dysfunction;

vertebrogenic disorder of the lumbar spine; anxiety; and depression. [13] (citing 20 C.F.R. §§ 404.1520(c) & 416.920(c)). However, the ALJ determined that Boston's eye impairment and asthma are non-severe conditions. [14]. Both parties agree with this determination, and therefore, the Court finds that substantial evidence supports the ALJ's findings for the second step.

### E. Step Three and Listing 1.04(A)

Boston and the Commissioner are in disagreement over the ALJ's step three determination. In her brief, Boston alleges that the ALJ failed to properly consider the medical opinion evidence when determining whether or not her cervical spine disc injury met or equaled the criteria of Listing 1.04 (disorders of the spine) (Dkt. No. 8, at 26–30). The Commissioner argues that the medical evidence in the record failed to establish the criteria in regards to motor loss accompanied by sensory or reflex loss (Dkt. No. 13, at 13–16).

The pertinent listing in this matter, 1.04A, covers disorders of the spine (*e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. The listing requires:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive strait-leg raising test (sitting and supine); . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).

In order to satisfy the first criterion of Listing 1.04(A), Boston must provide evidence of nerve root compression. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). The Commissioner does not appear to contest the presence of nerve root compression; however, the Court will briefly discuss the criterion as it applies to this case. An MRI of the cervical spine on February 7, 2011, revealed a small to moderate left paracentral disc herniation at C5–C6 impinging on the exiting

17

left C6 nerve root. [589]. A subsequent MRI on May 3, 2011 revealed: (1) a minimal broad based central disc herniation of the protrusion type measuring less than 2mm, which minimally impinges upon the anterior subarachnoid space at C4–C5; (2) a broad based central/left paracentral disc herniation of the protrusion type measuring approximately 4mm, which impinges upon the anterior/left anterior aspect of the spinal cord at C5–C6, with a significant impingement upon the exiting left C6 nerve root suspected; and (3) a minimal diffuse disc bulge of the annulus fibrosis measuring less than 2 mm, which minimally impinges upon the anterior surface of the thecal sac at C6–C7. [655–56]. Most recently, an MRI of the cervical spine conducted on August 28, 2014, showed a disc protrusion at C5–C6 resulting in left foraminal encroachment and left parasagittal spinal cord indentation. [1106].

Additionally, Boston also points to a positive Spurling's test found by her physical therapist, Rachel Sisson, on September 4, 2014. [1103]. Furthermore, the ALJ himself listed "nerve damage of the bilateral upper extremities due to cervical spine dysfunction" as one of her severe impairments. [13]. Therefore, there is evidence in the record of nerve root compression.

To satisfy the second criterion of Listing 1.04(A), Boston must provide evidence of neuro-anatomic distribution of pain. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). Similar to the first criterion, the Commissioner does not deny the presence of neuro-anatomic distribution of pain, but the Court will also discuss it briefly. Courts have found the presence of neuro-anatomic pain where the medical records have shown that the plaintiff continuously complained to her [his] physicians of pain. *See Crump v. Astrue*, No 7:06–CV–1003 NAM/DRM, 2009 WL 2424196, at *4 (N.D.N.Y. Aug. 5, 2009) (finding evidence of neuro-anatomic distribution of pain where the "plaintiff continually complained of chronic back pain…with numbness, tingling and weakness down his right leg to his foot"); *see also Muntz v. Astrue*, 540 F. Supp. 2d 411, 420

(W.D.N.Y. 2008) (finding evidence of neuro-anatomic pain "where the plaintiff complained to treating and examining physicians of back pain with radiation of numbness and weakness"). Here, Boston reported pain, rated at a 7/10 in her neck and 10/10 in her right upper extremity, to Dr. Leonardo on May 12, 2011. [635]. She again reported pain to Dr. Leonardo, this time rated 10/10 in her neck and upper extremities bilaterally, on July 8, 2014. [1085]. The medical record contains evidence of numerous other occasions where Boston reported pain in her neck and/or upper extremities to physicians. [632, 760, 871, 901, 903, 919, 923, 925, 931, 941, 944, 1097]. Based on the consistent complaints of pain being made by Boston, the record contains evidence of neuro-anatomic distribution of pain.

To satisfy the third criterion of Listing 1.04(A), Boston must provide evidence of limitation of motion of the spine. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). Similarly to the first two criterions, the Commissioner does not dispute the presence of limitation of motion of the spine. However, the Court will still briefly discuss the criterion as it applies to this matter. As articulated above, an examination conducted by Dr. Leonardo on June 9, 2011, revealed that AROM was decreased in all planes of Boston's neck. [661]. Additionally, the consultative examination conducted by Dr. Arora on December 20, 2011, revealed reduced forward flexion of 30 degrees, extension of 10 degrees, lateral flexion of 15 degrees on the right and 20 degrees on the left, and rotation of 40 degrees bilaterally. [751]. Based on the undisputed medical evidence in the record, there is evidence of limitation of motion of the spine.

Next, to satisfy the fourth criterion of Listing 1.04(A), Boston must provide evidence that indicates motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). Boston and the Commissioner differ over this criterion. Boston contends that the medical record does

contain evidence of motor and sensory loss (Dkt. No. 8, at 29). Specifically, Boston points to an appointment held on September 2, 2014, where Dr. Leonardo found decreased sensation to pinprick and light touch in the C8 dermatome. [1098]. Additionally, Boston points to an appointment held on September 4, 2014, where Ms. Sisson found slightly reduced bilateral upper extremity strength (4/5) throughout. [1103]. On that same visit, Ms. Sisson also found loss of sensation at C8 in the right upper extremity. [1103].

The Commissioner argues that the medical record lacks substantial evidence of motor loss accompanied by sensory or reflex loss (Dkt. No. 13, at 11–14). First, the Commissioner asserts that Ms. Sisson is not an acceptable medical source since she is a physical therapist (Dkt. No. 13, at 11). Further, the Commissioner notes that the appointment with Dr. Leonardo on September 2, 2014 showed full motor strength (5/5) in the upper extremities, which causes Boston to fall short on this criterion (Docket No. 13, at 12). Additionally, the Commissioner points to various examinations in the record that show unremarkable findings with regard to this criterion (Dkt. No, 13, at 13).

The Commissioner is correct that "a physical therapist is not an 'acceptable medical source' as defined in the social security regulations." *Acevedo v. Colvin*, 20 F. Supp. 3d 377, at 389 (W.D.N.Y. 2014) (citing 20 C.F.R. § 404.1513). However, "the opinions of physical therapists may constitute substantial evidence where the opinions are well documented and supported by the medical evidence." *Acevedo*, 20 F. Supp. 3d at 389 (citing S.S.R. 06–03p, 2006 WL 2329939). Additionally, the "ALJ has the discretion to determine the appropriate weight to accord the [other source's] opinion based on all of the evidence before him…." *Acevedo*, 20 F. Supp. 3d at 389 (quoting *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995). Here, there is no long-standing relationship with Ms. Sisson that would cause her to have greater knowledge of

20

Boston's functioning and the reported findings appear to be inconsistent with the record as a whole. Furthermore, the assessment of Ms. Sisson is also less persuasive due to the fact that Dr. Leonardo examined Boston just two days earlier and assessed full motor strength (5/5). Accordingly, discounting the opinion of Ms. Sisson would be supported by substantial evidence.

In addition to the medical evidence emphasized by Boston, Dr. Bansal found decreased sensation in the right ulnar over the course of six appointments between November 27, 2013 and May 28, 2014. [926, 929, 932, 938, 942, 945]. However, during and after this time period, Dr. Singh's examinations found no motor or sensory loss. [901–04, 948–49]. Further, outside of the appointment with Ms. Sisson, medical evidence of motor loss is virtually absent in the record. Based on the record as a whole, there is insufficient evidence of motor loss accompanied by sensory or reflex loss.

The last criterion required for Listing 1.04(A) is a positive SLR test. The ALJ correctly noted that "numerous more current examinations have shown that [Boston] has negative SLR tests." [14]. However, in evaluating whether or not Boston's impairment meets the criteria of Listing 1.04(A), a positive SLR test is only required when the applicable impairment involves the lower back. *Szarowicz v. Astrue*, No. 11-CV-277S, 2012 WL 3095798, 3 n.5 (W.D.N.Y. July 30, 2012); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). Based on the record, it appears undisputed that Boston's injury does not involve the lumbar spine, but the cervical spine. Accordingly, the requirement of a positive SLR test is inapplicable to this matter.

At the third step, the burden falls upon the plaintiff to show that her impairment meets or is medically equal to a listing. *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 272 (N.D.N.Y. 2009); *Naegele v. Barnhart*, 433 F. Supp. 2d 319, 324 (W.D.N.Y. 2006).  In order to satisfy Listing 1.04(A), a claimant's impairments must meet all of the specified medical criteria. *Sullivan v.*

*Zebley*, 493 U.S. 521, 530 (1990); 20 C.F.R. §§ 404.1525(d), 416.925(d). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530 (citing S.S.R. 83–19, 1983 WL 31248).

Boston argues that even if all of the requirements needed to meet Listing 1.04(A) are not currently met, it is sufficient that they have all been met at some point since the "central requirement" of nerve root or cord compromise existed through the entirety of the claim (Dkt. No. 14, at 7). The Fourth Circuit agrees with this standard to the extent that "Listing 1.04(A) requires a claimant to show only…that each of the symptoms are present, and that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months." *Radford v. Colvin*, 734 F.3d 288, 294 (2013) (citing 20 C.F.R. § 404.1509).

In contrast, the Social Security Administration ("SSA") has expressed through an Acquiescence Ruling, that the court's holding in *Radford* "is inconsistent with [SSA's] interpretation of listing 1.04(A) and of the severity and durational requirements at step three of the sequential evaluation process." Soc. Sec. Acquiescence R. 15–1(4), 80 FR 57418–02, 2015 WL 5564523, at *57420 (Sept. 23, 2015). When enumerating the medical criteria required in paragraph A, Listing 1.04(A) uses the conjunction "and" to "establish that the entire set of criteria must be present at the same time on examination." *Id.* Further, "when the listing criteria are scattered over time, wax and wane, or are present on one examination but absent on another, the individual's nerve root compression [does] not rise to the level of severity required." *Id.* To meet the requisite severity of 1.04(A), the simultaneous presence of all the medical criteria is required. *Id.* Regarding the durational requirement, the simultaneous presence of all medical criteria must continue, or be expected to continue, for a continuous 12-month period. *Id.*; 20 C.F.R. §§ 404.1525(c)(4), 416.925(c)(4).

22

In this instance, all of the medical criteria required for Listing 1.04(A) have not been simultaneously present for a continuous 12-month period nor are they expected to continue for a continuous 12-month period. Ms. Sisson's finding of slightly reduced motor loss, for the reasons articulated above, is insufficient to meet that criterion. Otherwise, evidence of motor loss appears to be virtually absent from the record. Accordingly, even if this Court chose to disregard the policy of the SSA, which was articulated in the Acquiescence Ruling, and follow the standard established by the Fourth Circuit, Boston's impairment would still not satisfy the requirement of Listing 1.04.

An ALJ is required to sufficiently explain his [her] determination that a claimant failed to meet or equal a listed impairment. *Berry*, 675 F.2d at 469. However, an ALJ's analysis may be upheld where the Court is able to look to other portions of the decision and other clearly credible evidence that demonstrate the ALJ's decision was supported by substantial evidence. *Id.*; *Kretovic v. Colvin*, No. 13-CV-6257P, 2015 WL 1297875, 22 (W.D.N.Y. Mar. 24, 2015); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507–08 (S.D.N.Y. 2014*). See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112–13 (2d Cir. 2010) (summary order) (stating that "the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence"); *but see Berry*, 675 F.2d at 469 (stating that "cases may arise, however, in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record…in such instances, we would not hesitate to remand the case for further findings or a clearer explanation for the decision").

As articulated above, evidence of motor loss in the record is lacking. The record has shown that treating physicians have continuously found full strength in Boston's upper

extremities. Accordingly, the Court is able to look to clearly credible evidence in determining that the ALJ's decision was supported by substantial evidence.

Boston contends that the ALJ, in determining whether her impairments met the criteria required for Listing 1.04(A), used a single examination by the one-time consulting neurologist Dr. Arora, which showed full strength (5/5), normal reflexes, and no sensory deficit; however, he "ignored all of the abundant and conflicting evidence in the record" (Dkt. No. 8, at 28). Boston correctly asserts that the Second Circuit has "previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013). *See also Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (stating that "in evaluating a claimant's disability, a consulting physician's opinions or report[s] should be given limited weight"). The Second Circuit justified this approach because "consultative exams are often brief, are generally performed without benefit or review of claimant's medical history, and at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." *Id.*

Admittedly, the ALJ stated that "greater weight is given the opinion of consultative examiner, Dr. Arora." [31]. However, the ALJ correctly stated that the findings of Dr. Arora, which are consistent with the ALJ's opinion, are "more consistent with the examinations by the claimant's treating physicians." [31]. There are scant medical records that show decreased sensation or motor strength. However, numerous medical records, including those provided by Dr. Singh, a treating physician, show full motor strength (5/5) and normal sensation. Accordingly, the "greater weight" assigned to Dr. Arora's opinion, even if erroneous, is harmless since reviewing the entire record would produce similar findings.

### F. Steps Four and Five

With respect to steps four and five of the five-step inquiry, Boston contends that the ALJ erred in failing to explain why, when determining her RFC, he selectively rejected favorable portions of State Agency review neurosurgeon Dr. Layne's opinion (Dkt. No. 8, at 22–26). Specifically, Boston points to the handling (gross manipulation) and fingering (fine manipulation) limitations noted by examiner Wahl and then affirmed by Dr. Layne, which are absent from the RFC determination. Boston further asserts that such a legal error is not harmless, as the four jobs suggested by the VE and adopted at step five, each require handling and fingering (Dkt. No. 8, at 24–25). Indeed, all four jobs would be precluded if the hypothetical person presented by the ALJ was unable to use their dominant arm for fine manipulation. [83].

In general, an ALJ is not required to "reconcile explicitly every conflicting shred of medical testimony." *Dioguardi v. Commissioner of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006); *Raymer v. Colvin*, No. 14-CV-6009P, 2015 WL 5032669, at *5 (W.D.N.Y. Aug. 25, 2015); *Chmura v. Berryhill*, Case No. 16-CV-205-FPG, 2017 WL 1829728, at *3 (W.D.N.Y. May 8, 2017). Further, there is no "absolute bar to crediting only portions of medical source opinions." *Raymer*, No. 14-CV-6009P, 2015 WL 5032669, at *5; *Younes v. Colvin*, No. 1:14-CV-170 (DNH/ESH), 2015 WL 1524417, at * 8 (N.D.N.Y. Apr. 2, 2015); *Labonte v. Berryhill*, Case No. 16-CV-518-FPG, 2017 WL 1546477, at *3 (W.D.N.Y. May 1, 2017). However, an ALJ who adopts only portions of a medical opinion in the RFC assessment must explain his or her decision to reject the remaining portions. S.S.R. 96–8p, 1996 WL 374184; *Raymer*, No. 14-CV-6009P, 2015 WL 5032669, at *5; *Chmura*, Case No. 16-CV-205-FPG, 2017 WL 1829728, at *3. *See Dioguardi*, 445 F. Supp. 2d at 297 (holding that the ALJ had committed error where she adopted the portion of a doctor's statement that restricted plaintiff from reaching

above the shoulder, but disregarded the lifting and carrying restrictions without explanation); *see also Edwards v. Colvin*, 15-CV-6426, 2016 WL 5110036, at *4 (W.D.N.Y. Sept. 21, 2016) (holding that "because the Court is unable to determine why the ALJ chose to disregard opinion evidence that was more favorable to plaintiff's claim, remand is warranted").

The ALJ did not ignore the existence of CTS in Boston's medical records. In fact, carpal tunnel was mentioned numerous times in the portion of the opinion that addressed Boston's RFC determination. [17, 20, 21, 22, 26, 31]. In his opinion, the ALJ assigned "significant weight" to the opinion of state agency neurosurgery consultant, Dr. Layne. [31]. In particular, the ALJ noted that Dr. Layne "opined … that all studies in the record, as well as examinations, were normal." [31]. The ALJ qualified the weight given to Dr. Layne's opinion by stating that "neurosurgery seems an appropriate specialty to place extra reliance on." [31]. Greater weight seems to have been given to the consultative examiners in the medical record. However, the ALJ also notes multiple times that consultative opinions were more consistent with the examinations by Boston's treating physicians. [31]. Accordingly, the fine and gross manipulations seem to be excluded from the RFC assessment since the record as a whole shows no problems with motor loss.

Even if the ALJ completely ignored Boston's CTS in the RFC assessment, there would not have been much to consider since she seems to be dealing with the condition through purely conservative treatments. Where the medical record indicates that a plaintiff has declined available treatment or surgery for a condition, courts have found that this evidence supports a finding that the condition is not disabling. *See Cypress v. Colvin*, 807 F.3d 948, 951 (8th Cir. 2015) (noting that where the plaintiff argued that the RFC should have included manipulative limitations due to her diagnosis of bilateral CTS, the plaintiff's refusal of surgical intervention

suggested that the condition was not disabling); *see also Goodale v. Halter*, 257 F.3d 771, 774–75 (8th Cir. 2001) (stating that when the plaintiff refused recommended surgery to correct her carpal tunnel condition, the ALJ permissibly regarded the decision as an indication in the plaintiff's own judgment that her CTS was something she could live with). Additionally, a physician's decision to pursue conservative treatment rather than surgical intervention may also indicate to courts that a condition is not disabling. *See Strong v. Colvin*, Civil Action No. 2:13cv751-CSC, 2014 WL 2440969, at *6 (M.D. Ala. May 30, 2014) (stating that the neurologist's choice of a "relatively conservative course of treatment, consisting of pain medications, injections and hand braces" showed that he "apparently, did not think that the claimant's [CTS] was severe enough to recommend carpal tunnel release surgery").

The most recent medical records show that Boston did not wish to pursue surgical intervention for her condition. [925]. Additionally, it appears that she has received a conservative course of treatment throughout the course of the record including: taking pain medications, seeing a pain management specialist, and wearing hand braces. The fact that the one of the most recent medical records states that surgical intervention would be elective also seems to show that Boston's condition of CTS is manageable. [1086]. Accordingly, the Court is able to understand why the ALJ chose to reject the portion of Dr. Layne's medical opinion containing limited fine and gross manipulation, and the decision to leave those limitations out of the RFC is supported by substantial evidence.

The Court notes that it does not know what outcome would have resulted if it had conducted an original review of Boston's claims. However, "[i]t is not the function of a reviewing court to decide de novo whether a claimant was disabled, or to answer in the first instance the inquiries posed by the five-step analysis set out in the SSA regulations." *Melville v.*

27

*Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted); *cf. Lamay v. Comm'r*, 562 F.3d 503, 507

(2d Cir. 2009) ("In reviewing a final decision of the SSA, this Court is limited to determining

whether the SSA's conclusions were supported by substantial evidence in the record and were

based on a correct legal standard.") (citation omitted).

## IV.    CONCLUSION

For the foregoing reasons, this Court respectfully recommends granting the

Commissioner's Motion for Judgment on the Pleadings (Dkt. No. 13).  The Court further

recommends denying Boston's cross-motion (Dkt. No. 8).

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by

electronic filing on the date below. Any objections to this Report and Recommendation must be

electronically filed with the clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 72. "As a rule, a party's failure to object to any purported error or omission in a magistrate

judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d

Cir. 2003) (citations omitted).

SO ORDERED.


*/s/ Hugh B. Scott*
_____
**HONORABLE HUGH B. SCOTT**
**UNITED STATES MAGISTRATE JUDGE**


DATED: August 2, 2017